**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

TAVIN D. DAVIS

        Plaintiff,

CIVIL DIVISION

Civil Action No.  2:21-CV-580

RICHARD QUINN; JARED SLATER;
JASON SWOPE; THOMAS DUBOVI, SR.;
MARTY GRIMM; CHRISTOPHER PARIS;
WILLIAM BROWN; WILLIAM MAITLAND;
ROBERT EVANCHICK

        Defendants.

**JURY TRIAL DEMANDED**

<u>**COMPLAINT**</u>

Plaintiff, Tavin D. Davis ("Mr. Davis"), by and through his undersigned counsel, The Lacy Employment Law Firm LLC, hereby files this Complaint against Defendants and states as follows:

<u>**OVERVIEW**</u>

Mr. Davis endeavored, as an African-American man, to become part of the solution within the police force, which has yet to treat the people it protects and serves with equity and dignity. Although Mr. Davis became a trooper, he never enjoyed the "blue code" that the majority of his colleagues take for granted. Rather, officers, and the PA State Police as an entity, discriminated, harassed, and retaliated against him.

In this Complaint, Mr. Davis details shocking revelations – to some – regarding the overt racism that continues to occur within the PA State Police. Systemic racism is exemplified throughout. There is classic racism; that is, the use of the n-word to refer to black people. There is historic racism; that is, the symbolic hanging of an object draped in a noose. And there is

systemic racism; that is, the prolific profiling of black citizens that Mr. Davis was forced to witness and endure during the course of his police duties.

After attempting to raise these concerns, Mr. Davis suffered even further disparate treatment and retaliation. His supervisors cut his overtime pay. He was given petty disciplines that his supervisor did not levy against his white cohort. He lost training and promotion opportunities. And he was ultimately forced to move his family across the state in an effort to avoid the racial animus in his troop.

**PARTIES**

1.      Mr. Davis is an African-American male and current Trooper in the PA State Police.

2.      Mr. Davis is an individual and a citizen of the Commonwealth of Pennsylvania.

3.      Defendant Thomas Dubovi, Sr. was, at all relevant times, the Captain and head of Troop-A in Greensburg. He set the standard for the practices and polices. He had the power to make certain troop-level personnel decisions, such as termination, assignment, promotion, and demotion. As the Captain, Mr. Dubovi knew of all Equal Employment Opportunity ("EEO") Complaints filed within the department.

4.      Defendant Lt. Richard Quinn was, at all relevant times, the Patrol Section Commander. Lt. Quinn was, at all relevant times, the EEO liaison. He had the power to enforce employment practices within the troop, including, but not limited to, termination, assignment, promotion, and demotion.

5.      Defendant Sgt. Jared Slater was, at all relevant times, Mr. Davis's supervisor who engaged in retaliation and other discriminatory actions and who also ratified the actions of his subordinates.

6.      Defendant Corporal Swope was, at all relevant times, another of Mr. Davis's supervisors who engaged in retaliation and other discriminatory acts and also ratified the actions of his subordinates.

7.      Defendant Lt. Colonel Christopher Paris was, at all relevant times, Mr. Davis's superior officer and supervisor that oversaw the Bureau of Human Resources, the Bureau of Training and Education, the Bureau of Integrity and Professional Standards, and the Discipline Office.  Defendant Paris failed to take corrective action after being made aware of persistent discrimination within the PA State Police. Defendants Paris had the authority to make Trooper Davis whole after his subordinates found violations of EEO policy and Defendant Paris failed to make any attempt to address the violations and rectify Mr. Davis's employment status.

8.      Defendant William A. Brown was, at all relevant times, Mr. Davis's superior officer and supervisor.  He is the Director of the Equality and Inclusion Office. Defendant Brown was notified of a pattern of practice in the Troop A- Greensburg barracks that cultivated a hostile work environment full of discriminatory harassment based on race.  Defendant Brown failed to take corrective action after being made aware of the persistent issues. Defendant Brown had the authority to take corrective action to prevent these issues from persisting and failed to do so.

9.      Defendant Lt. Maitland, Internal Affairs Division Western Section Commander, was assigned to conduct an investigation following Mr. Davis's EEO Complaint. Rather than conduct an EEO investigation, he conducted an IAD investigation.  Defendnat Maitland attempted to cover up EEO violations and never took corrective action against the offending officers.

10.    Colonel Robert Evanchick is the commissioner of the PA State Police. He is the highest officer within the force. Defendant Evanchick had, at all relevant time, knowledge of the pattern and practices of discrimination that prevaded the PA State Police.  He also had personal knowledge of Mr. Davis's complaints of racial discrimination and retaliation.

## JURISDICTION AND VENUE

11.    The causes of action which form the basis of this matter arise under section 1983, pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1333.

12.    Venue is proper in the District Court under 28 U.S.C. §1391(b) and 42 U.S.C. §2000(e)-5(f).

## FACTS

13.    On or around September 18, 2017, Mr. Davis enlisted with the Pennsylvania State Police ("PA State Police").

14.    On September 23, 2017, Mr. Davis tasted the first of many bits of racism in the PA State Police department.  As a state cadet, Trooper Marty Grimm  (white male) reiterated Trump's statement that equated black NFL players who protested the national anthem to "sons-of-bitches." At this time, very few, if any, white players kneeled for the national anthem. Trooper Grimm then called the NFL the "National Felons League."  It's widely known that approximately 70% of the NFL consists of black males.  Trooper Marty Grimm presupposed that a professional sports league, consisting of mainly black athletes, were felons and "sons of bitches."  Multiple black troopers were offended by the racist remarks.  Mr. Davis, following these comments, made a complaint to academy staff.

15.    The very next day, Troper Grimm roared into the classroom and exclaimed that: "I don't give a fuck if I hurt some snowflakes feelings. I try to keep you all informed on current

4

events, but now it is going to be straight traffic." This statement was in retaliation for making a complaint regarding the formation of a hostile work environment.

16.     Trooper Grimm was only given a supervisor's notation for this infraction that he committed while on duty.    Supervisory notations are minor infractions that only stay in a supervisor's file for a one-year period.  IAD investigations, however, remain on a member's permanent department personnel file record.

17.     Just two months later, academy staff informed Mr. Davis of his student leader assignment.  And they also advised him that they no longer needed his cadet services.

18.     In or our around the time Mr. Davis received an accommodation/promotion, he, unfortunately, was already being subjected to other racial discrimination and harassment.   Mr. Puff, who served as an academy civilian kitchen staff, sent for Mr. Davis.  After Mr. Davis arrived in the cafeteria, Mr. Puff yelled: "Who the fuck do you think that you are? When you are assigned a duty, your ass needs to be on time and in uniform for that duty."   He then physically charged towards Mr. Davis with clenched fists.   Civilian staff supervisor, Mr. Weldon, physically restrained Mr. Puff from continuing his physical assault.

19.     Although Mr. Davis had been with the force for only two months, the racism levied against him would continue.  In fact, it had only just started.

20.     From November to April 3, 2018, Mr. Davis continued to suffer from microaggressions while performing his job. But, on April 3, 2018, suffered more overt racial behavior.   On April 3, 2018, Mr. Davis was promoted to Trooper.  As a Trooper, Mr. Davis received the code to enter the station facility.  Upon his arrival, Trooper Terek (white male), detained Mr. Davis and asked him what his "business" was at the station.  Instead of assuming

5

that Mr. Davis was a fellow Trooper and colleague, Trooper Terek presupposed that Mr. Davis was a black male who did not belong.

21.    In May 2018, the hostile and pervasive racism and harassment intensified.  Mr. Davis's colleagues hung a garden gnome outside of his locker-room door with duct tape around its neck.  Black Americans – almost every black American that reaches adulthood – knows and understands the significance of nooses in this country.  Countless human beings were lost to mass lynchings in the South.  Near all these lynchings were perpetrated by the white majority against blacks during reconstruction and Jim Crow.  A noose transcends past a metaphor.  It remains a symbol.  A symbol that black people are less than human beings and easily discarded. This symbol was used to intimidate, harass, and subject Mr. Davis to the most hostile of environments.

22.    In or around 2018, Mr. Davis partnered with Trooper Ditzler.  During the course of their business, and acting under color of law, Trooper Ditzler told Mr. Davis that there are two types of black people: black people and "n-words.[1]"  Mr. Davis took this to mean that his partner believed that there is a certain type of black person capable of basic humanity.  And there is another type, "n-words," that are akin to their ancestors who were treated as nothing more than disposable property.  This conversation irreparably scarred Mr. Davis.  Any hope at continuing his employment within this department was dashed as he heard these words.

23.    Trooper Ditzler's discriminatory conduct continued to pervade Mr. Davis's work environment.  He witnessed multiple instances of racial profiling and disparate treatment while partnered with Trooper Ditzler.

---

[1] Plaintiff does need not repeat this racial epitaph. Every American knows, or should know, the pain that black Americans associate with this word.  And it does not need to be repeated any more often than it is already used.

6

24.     On May 29, 2019, Mr. Davis was coming off an overnight shift and he had a trainee with him; they were at the end of working a ten-day stretch.  Each day a trooper has to file an observation report.  At this time, Mr. Davis was working on reports in the control room.  The control room was full of other troopers.  Suddenly, Trooper Folino takes a stack of papers, throws them on the table, and screams: "what the fuck is this."  Mr. Folino threatened Mr. Davis with his fists clenched.  The two had a dispute about Trooper Folino not completing his incidents.  Trooper Folino then leaves the patrol room.  After a few minutes, Trooper Folino came back and again slammed the papers on the floor.   This was in response to Mr. Davis refusing to do Troper Folino's reports for him.  Trooper Folino attempted to bully Mr. Davis into doing his job.  Defendant Swope then entered and screamed "this ends now."

25.     Mr. Davis attempted to make an EEO complaint regarding the incident of physical intimidation to Corporal Swope (white male) on May 29, 2019.  Further, Trooper Davis detailed the disparate treatment of both him and civilians to Swope.  For example, Mr. Davis saw another trooper throw a young 15-year old black woman down a flight of stairs.  In fact, this trooper bragged about using force against this young woman.   This officer refused to acknowledge the excessive use of force in his incident report.  Mr. Davis noticed, however, that troopers did not take the same tact with white women.  Force was rarely, if ever, used in cases against white women.

26.     Mr. Davis brought these concerns to Corporal Swope. Instead of investigating the incident, Corporal Swope issued a supervisor's notation to both Trooper Folino and Mr. Davis. This is a formal disciplinary action against Mr. Davis and Trooper Folino. In the supervisor's notation, Corporal Swope distorted the facts to make it seem like both parties were equally at

fault. This was retaliation for reporting yet another aggression based on race and other instances of racial discrimination perpetrated by white troopers agaist black civilians.

27. Trooper Folino was never disciplined past this notation. Instead, Trooper Folino was given a preferential employment opportunity.

28. After the physical intimidation incident, the hostile work environment worsened. When he would walk into the room, the other troopers would immediately go silent. Now, he was at the point where other officers did not trust him.

29. On June 3, 2019, Lt. Quinn (white/male EEO Liaison) requested to speak with Mr. Davis regarding his EEO Complaint. Lt. Quinn advised Mr. Davis that the conversation would remain confidential. Mr. Davis – given the promise of confidentiality – went on to provide detailed accounts of implicit bias and racial profiling that fellow officers committed against minorities and discrimiation/harassment against himself in the force. Rather than substantively responding to Mr. Davis's attempt to bring important racial issues in policing to light, Lt. Quinn asked Mr. Davis how he felt about affirmative action. Mr. Davis felt – as many black employees would – that his question probed his qualifications as a black Trooper in the force. Given Mr. Davis's propensity for conversation and education, Mr. Davis indulged Lt. Quinn's question and conversed with him about the topic. After the meeting, Lt. Quinn never followed up with Mr. Davis. Nor did he investigate the issues.

30. During the meeting with Lt. Quinn, Mr. Davis divulged each and every incident of racial discrimination noted to date in this Complaint. Lt. Quinn said "that if things like this are going on said that he wanted to make sure that none of this was going on." Instead, he ended the conversation questioning the merits of affirmative action.

31.    On June 13, 2019, Mr. Davis formally filed an EEO Complaint, which detailed the discrimination and hostile work environment that he had experienced thus far, including the incident with Trooper Ditzler and Trooper Folino.

32.    Captain Thomas Dubovi, Sr. was aware of the EEO Complaint. Still, despite having knowledge of its contents, he acquiesced to his subordinates's violations. The department was rife with racial discirmination.  Mr. Davis took painstaking efforts to delineate those violations to those up the chain of command.  Yet Captain Dubovi refused to discipline his subordinates, enforce existing policies aimed at erradicating racial discrimination, or promulgate new polices to tackle these racial issues.  Simply, Captain  Dubovi did nothing but keep the status quo.

33.    In or around July 2019, Mr. Davis was assigned to a shift in which his fellow officers promulgated comments that black members of congress should go back to the countries from which they came. These same officers later made disparaging remarks about black communities, including Baltimore, which his fellow officers referred to as a rat and rodent infested mess.

34.    On July 11, 2019, Lt. Maitland informed Mr. Davis that he  received Mr. Davis's EEO Complaint that he filed on June 13, 2019, and that he should be prepared to discuss it with him.   Lt. Maitland made no mention that the EEO investigation would morph into a routine IAD investigation.

35.    In or around August 2019, members of Mr. Davis's patrol unit responded to a call regarding the distribution of Ku Klux Klan ("KKK") literature. The white members all viewed the evidence in the patrol room.  Mr. Davis, however, was not allowed to physically possess this

evidence.  Upon information and belief, this evidence was never submitted into property and evidence.

36.    In or around August 2019, Mr. Davis responded to a house party noise complaint on Zeller Street in Greensburg.   The officers observed several college age black males peacefully standing outside of a residence.   There were approximately 30-50 college age civilians at this party and many civilians departed upon PA State Police's arrival.  Mr. Davis was driving his patrol unit and observed his partner unholster his weapon as they exited the vehicle. Yet in October 2019, Mr. Davis responded to a field party in Unity Township.  There were 200 high school to college age students present at this party.  Most, if not all, of the civilians were white.  Unlike in Greensburg, many juveniles started to flee the scene.  But no officer withdrew their weapon.

37.    In August 2019, Mr. Davis purchased a new vehicle and had the two front windows tinted. Approximately one week after driving the new vehicle to the station, Lt. Steven Paraska (white male) sent out a station-wide email regarding vehicles that were parked on the parking lot that were in violation of Pennsylvania Motor Vehicle Code.  Lt. Paraska informed Mr. Davis that he ran Mr. Davis's license plate and that his personal vehicle had a vehicle code violation. The following day his assigned supervisor Cpl. Matthew Hartman (white male) advised him that his vehicle needed to be removed from the station parking lot. He was told that he needed to remove the tint from his windows immediately or refrain from parking in the station parking lot.  White troopers were not subject to discipline for this conduct.  Mr. Davis was singled out yet again.

38.    Mr. Davis observed Troopers Troy Faulk (white male with a dark blue Volkswagen sedan) and Sean Kelly (white male with a green Ford Crown Victoria) drive their

vehicles with tint on the windows. Neither by Lt. Paraska, or anyone else, them to remove their tint or to park offsite. Additionally, Mr. Davis also observed construction personnel, Municipal Police Officers, and other PSP personnel – all of whom were white – drive their vehicles onto the parking lot with tint on their vehicles as well. None of these individuals were subjected to the same treatment as Mr. Davis.

39.    After complaining about the discriminatory conduct within Troop-A, Mr. Davis saw his overtime drop.  Troopers make a significant portion of their salary based on overtime pay.  Previously, Mr. Davis received a substantial amount of overtime pay.  The reduction of his overtime pay was in retaliation for making complaints within the department.

40.    In or around November 2019, Mr. Davis complained to Sgt. Slater that he was not offered overtime.  And that white troopers had preference and were receiving overtime. Mr. Davis received a single four-hour block of overtime after complaining.  At this time, Sgt. Slater allocated three four-hour blocks of DUI overtime to a white trooper.  Mr. Davis observed that white troopers were given overtime and not making any DUI stops.  It was highly encouraged in the force that if you were receiving DUI overtime, you were supposed to make stops.  Yet Mr. Davis was not offered the chance to receive the same level of overtime.

41.    In January 2020, Mr. Davis requested training for the position of Instructor Development, Ground Defense, and Interview and Interrogations.  Sgt. Jared Slater (white male) denied his training because of Mr. Davis's impending transfer. This was not department policy and many other troopers with an impending transfer request were given this training. Sgt. Slater was well aware of Mr. Davis's participation in protected activity.  This was in clear retaliation for engaging in protected activity.

42.     This training opportunity would have provided Mr. Davis with a promotion opportunity.  In fact, this training was necessary for the promotion that Mr. Davis sought. Yet he was denied this opportunity based on the pretextual reason that his transfer prevented him from receiving the training, which constitutes an adverse employment action.  If Mr. Davis received the training, his promotion would have carried tangible employment benefits.  Further, troopers regularly submit leave requests and training requests to the PA State Police and these requests are honored despite an impending transfer.

43.     The PA State Police has not promoted Mr. Davis.  Instead, the PA State Police has consistently promoted less qualified, and similarly-situated, white males to positions that Mr. Davis expressed interest in.

44.     The training that Mr. Davis did not receive was a prerequisite for certain promotion opportunities.  Without it, Mr. Davis could not advance to specialized positions. Lt. Lt. Quinn, Captain Dobovi, and Sgt. Slater knew that Mr. Davis's career goal was to receive this training and become a specialized instructor with the department.  They denied him of this tangible employment benefit.

45.     In April 2020, Mr. Davis received his yearly performance review.  He made 24 driving under the influence ("DUI") arrests.  He made 27 the year prior.

46.     On March 14, 2020, Mr. Davis transferred from Troop-A-Greensburg to Troop H-Lykens.  He was forced to transfer because of the culture at the Greensburg station, which exhibited racial discrimination, racial profiling, and a hostile work environment.  Mr. Davis advised Lt. Quinn of the nature of the hostile work environment and discriminatory actions that Mr. Davis faced.  Yet he, and other officers did nothing to eliminate and take corrective action

against this behavior.  Mr. Davis did not feel safe in Greensburg.  He had no other option but to transfer.

47.     His transfer was akin to a constructive discharge.  At this point, Mr. Davis had endured being equated to either a black person or a "n-word."  He witnessed people of color, who resembled his appearance, racially profiled.  Later, he would find out that the PA State Police actually founded Mr. Davis's EEO complaint against the colleague who caused this hostility.  His entire troop knew that he made complaints of racism.  This includes his supervisor.  He no longer felt safe in that department.  They were not going to end the racism. So, he had no choice but to leave.

48.     On March 19, 2020, Mr. Davis posted a video on the social media website, Tik Tok.  Lt. Quinn filed a disciplinary action against Mr. Davis.

49.     On May 20, 2020, the department distributed a media policy, which advised troopers to not comment negatively about the "stay-at-home" policy that Governor Tom Wolf implemented or politics in general.  Corporal John Lindsay and Trooper Joseph Martin violated this directive by making remarks that were politically incendiary with respect to Governor Wolf, fervently expressing their distaste. Yet they were not punished by the department.

50.     On July 7, 2020, Mr. Davis was notified about the IAD violation.  On the face of the IAD, it is apparent that the PA State Police selectively enforced its policies and discriminated against Mr. Davis in the process. Lt. Quinn declined to use progressive discipline for this infraction, which he used for white males.  Further, Lt. Quinn selectively monitored Mr. Davis's social media account.  He did not monitor the accounts of similarly-situated white Troopers at the station.  Neither Trooper Joseph Martin nor Corporal Lindsay were investigated

or disciplined for committing more egregious violations of the same policy. Mr. Davis received a two-day suspension in apparent retaliation for participating in protected conduct.

51.     On or around July 23, 2020, Mr. Davis made another Equal Employment Opportunity Discrimination Complaint ("EEO"). In his EEO Complaint, Mr. Davis noted the discriminatory acts that occurred since the start of his employment with the PA State Police and also delineated the retaliation he suffered as a result of reporting it. Mr. Davis sent this email to Colonel Robert Evanchick, Lt. Colonel Paris, and Captain Brown. Mr. Davis ensured that all three superiours/supervisors were aware of his second EEO Complaint. In it, Mr. Davis detailed the discrimination that occurred against him, including the events described in this Complaint. These incidents include: the physical aggression exhibited by Mr. Puff, the racial bias incidents within the police department against civilian officers, incidents of disparate treatment, and many other specific examples of racism within the department. Mr. Davis ensured that the very top of the PA State Police's chain of command were aware of the discrimination and hostility that occurred within the force.

52.     On October 27, 2020, Mr. Davis filed a charge with the EEOC. In his charge, he reported that his initial EEOC charge had not been investigated. On December 7, 2020,

53.     On January 22, 2021, the PA State Police submitted its position statement in response to Mr. Davis's EEO charge. On the same day, the PA State Police provided Mr. Davis with the disposition to his second EEO complaint filed in 2020. They did this through their EEOC position statement rather than the formal EEO internal process. At that time, they still had not provided the disposition to Mr. Davis's first EEO complaint. This was deliberate. The PA State Police quickly resolves other types of complaints. Yet it took the PA State Police over three months to resolve this one. And they did not even independently resolve it. They did it

through a position statement, which is submitted to a federal administrative agency, not the PA State Police department.

54.    On January 27, 2021, Lt. Clark provided the disposition for Mr. Davis's initial EEO complaint. the disposition of Mr. Davis's first EEO complaint.  It found that Trooper Ditzler did violate Mr. Davis's rights "as it pertains to discriminatory harassment based on the protected class: [r]ace."  Lt. Clark noted that Mr. Davis could contact him with questions regarding the investigation and determination.  The PA State Police claimed that their failure to timely provide a disposition to Mr. Davis's first EEO complaint was an administrative oversight.  Yet the timing, right after the PA State Police filed its EEOC position statement, states that this explanation is pretext.

55.    The PA State Police takes EEO complaints seriously.  In fact, there are very few of these types of complaints made each year and thus very few investigations that take place.

56.    Lt. Maitland characterized Mr. Davis's first EEO complaint as an IAD investigation.  These are two different forms of investigations and disciplinary proceedings.  Mr. Davis himself was subject to a retaliatory IAD for purportedly violating a social media policy. An IAD investigation can be a firm form of discipline if founded.  But it pales into comparison as to what an EEO investigation should entail.  The PA State Police, by and through its supervisors and policy makers, deliberately chose to not conduct a thorough EEO investigation in Mr. Davis's allegations of racial discrimination and hostile work environement.  Simply, Defendants implemented a pattern and practice where racial discrimination is given less weight than posting a clip on Tik Tok.

57.    The PA State Police's failure to timely respond to Mr. Davis's EEO Complaint was not an administrative error.  Rather, it was a deliberate attempt to stall.  The PA State Police

engages in a pattern and practice of stalling its EEO investigations.  The PA State Police has used this practice to thwart meritorious racial discrimination claims and avoid changing the policies and practices within the force.  The PA State Police, by and through its policymakers, have no interest in solving the racial problems that persist in the department.  Rather, they choose to bury internal complaints  without any regard to changing the culture that causes them. Defendants collectively are all aware of these practices.  And they act in agreement and concert together to implement them, stifling the civil rights of black troopers in the process.

58.     On February 3, 2021, Lt. Clark responded to an email that Mr. Davis sent and refused to answer questions regarding the investigation.  Instead, Lt. Clark redirected Mr. Davis to the EEOC investigator.   Mr. Davis submitted his rebuttal to the PA State Police's EEOC response.  The PA State Police, by and through Defendants, refused to independently investigate Mr. Davis's racial discrimination complaints.

59.     The PA State Police, including Defendants who had power, never took corrective action against Trooper Ditzler.  He did not lose any pay, benefits, and was not terminated.  The PA State Police, including all Defendants, continued to allow Trooper Ditzler to perpetuate a hostile work environment.

60.     The Defendants each enageed in individual acts of harassment in the course of their duties.   PA State Police personnel, including but not limited to Lt. Quinn, Sgt. Slater, Corporal Swope, Lt. Colonel Paris, Colonel Evanchick, Captain Brown, Lt. Maitland, and Captain Dubovi, were responsible for the working conditions in the PA State Police department and knew the picture of the pattern of racial discrimination that pervaded the department.

61.     Each of these Defendants were well-aware of the discriminatory actions described within this Complaint.  Mr. Davis took painstaking measures to make each aware.  Yet, none of

16

the Defendants took any action to correct or otherwise implement policies to dissapate the discrimination and hostility.

62.    The PA State Police department, through its supervisors and policymakers, had a well-settled custom of race discrimination and harassment, which continues during Mr. Davis's tenure with the department.  Defendants individually and collectively created and continue to foster the well-settled custom of race discrimination and harassment.

63.    The PA State Police department did not, and still does not, have a policy in place that protects against race discrimination.   Defendants individually and collectively are responsible for this failure.

64.    Mr. Davis 's complaining of race discrimination/hostile work environemnt was a motivating and/or determinative factor in Defendants' retaliatory treatment of Mr. Davis, including the hostile work environment to which Mr. Davis was subject; Mr. Davis was forced to transfer out of Troop-A Greensburg.

65.    Defendants failed to prevent or address the discriminatory and retaliatory conduct referred to herein and further failed to take corrective action and remedial measures to make the workplace free of discriminatory and retaliatory conduct.

66.    The retaliatory actions taken against Mr. Davis after he complained of discriminatory conduct would have discouraged a reasonable employee from further complaining of discrimination.

67.    The discriminatory and retaliatory conduct of Defendants, as alleged herein, was severe and/or pervasive enough to make a reasonable person believe that the conditions of employment had been altered and that a hostile work environment existed, and made Mr. Davis

believe that the conditions of employment had been altered and that a hostile work environment existed.

68.    As a direct and proximate result of the discriminatory and retaliatory conduct of Defendants, Mr. Davis has in the past incurred, and may in the future incur, a loss of earnings and/or earning capacity, loss of benefits, pain and suffering, embarrassment, humiliation, loss of self-esteem, mental anguish, and loss of life's pleasure, the full extent of which is not known at this time.

69.    Defendants acted with malice, reckless indifference, and/or deliberate indifference to Mr. Davis's protected rights.

### COUNT I (Section 1983 and 1981)[2]
**Disrimination, Hostile Work Environment, Conspiracy**
*Plaintiff v. Defendants*

70.    Plaintiff hereby incorporates all allegations contained in the above-mentioned paragraphs as fully as if they were set forth at length.

71.    Defendants' discriminatory and retaliatory actions, as set forth herein, deprived Mr. Davis of equal protection under the law as guaranteed by the Fourteenth Amendment of the United States Constitution.

72.    As a result of Defedandts' actions, Defendants have denied Mr. Davis the right to the same terms, conditions, privileges and benefits of their employment with the Pennsylvania State Police, in violation of 42 U.S.C. § 1981 and  42 U.S.C. § 1983.

73.    Defendants' violation of the constitution included policies, practices, and/or customs to treat black employees in the PA State Police less favorably than male employees,

---

[2] Mr. Davis reserves the right to amend the Complaint to add his impending Title VII and PHRA claims after the respective agencies complete their investigations.

which was committed, directed, implemented, and/or ratified by officials of Defendants or Defendants in supervisory capacities with policymaking and decision-making authority.

74.    As a direct and proximate result of Defendants's acts and conduct, which caused and continue to cause Mr. Davis to be denied equal protection under the law, Mr. Davis has suffered and will suffer those injuries, damages, and losses alleged herein and has incurred and will incur attorneys' fees.

75.    The wrongful acts and conduct of Defendants were done with deliberate indifference to the statutory and constitutional rights of Mr. Davis.

76.    The actions of the Defendants, individually and collectively, all of which were taken under color of law.

77.    Mr. Davis suffered adverse employment consequences, specifically, Defendants retaliated by failing to train and promote Mr. Davis, his forced transfer to another department, and his cut in overtime pay.

78.    The PA State Police, by and through its supervisor and policymakers, had contemporaneous knowledge of the incidents of racial discirmination and harassment that Mr. Davis faced, and the inaction by PA State Police and its supervisors (Defendants) communicated messages of approval to the offending subordinates.

79.    The Defendants participated in violating Mr. Davis's rights and/or they directed others to violate them, and/or they had knowledge of and acquiesced in their subordinates's violation.

80.    This severe and pervasive environment continued throughout Mr. Davis's employment.  He attempted to find relief in the department's formal EEO procedures and was

19

continually advised by Defendants that the department would change its policies and practices. The PA State Police never did.

81.    Upon information and belief, Defendants were in agreement to not investigate complaints of discrimination within the force.  This was an unlawful violation of Mr. Davis's Fourteenth Amendment right to equal protection in the workplace.  The Defendants acted in furtherance of this scheme by quickly investigating other incidents of subordination in the force while deliberately not investigating EEO violations.  Mr. Davis sustained emotional and financial damages as a result of Defendants' conspiracy.

82.    Mr. Davis suffered other emotional damages, including a formal diagnosis of PTSD and anxiety.  This includes physical manifestations, such as loss of sleep, loss of appetite, loss of intimacy with his partner, loss of time with his children, prolonged period of depression, and an emergency room visit.

**COUNT II - FIRST AMENDMENT SECTION 1983**
*Plaintiff v. Defendants*

83.    Mr. Davis hereby incorporates all allegations contained in the above-mentioned Paragraphs fully as if they were set forth at length.

84.    The First Amendment through the Fourteenth Amendment and Section 1983, prohibits the State and local government actors from punishing employees for speaking out on matters of public concern.

85.    Serving as a police officer constitutes the type of governmental benefit or privilege the deprivation of which can trigger First Amendment scrutiny.

86.    Mr. Davis's comments about racial discrimination and profiling within the PA State Police are a matter of public concern and are thus protected speech under the First Amendment.

87.     Defendants, acting under color of law and by and through their agents, servants, and/or employees, engaged in retaliation against Mr. Davis due to his exercise of protected and established constitutional right to freedom of speech.

88.     The acts of Defendants are in violation of the United States Constitution and justify declaratory relief, including declaring that the policies, practices and/or customs of Defendants described herein violate Federal law, along with the award of attorneys' fees and costs under 42 U.S.C. § 1988.

89.     Mr. Davis made a formal petition; that is, he made two EEO complaints and an EEOC charge that are and were at all relevant time protected by the First Amendment.

90.     Mr. Davis was retaliated against for informing his superiors of the racial hostility, bias, and animonty that existed with the PA State Police.

91.     Mr. Davis was forced to transfer to another location to escape the severe and pervasive harassment, racial hostility, and retaliation.  Further, Mr. Davis was also subjected to harsher discipline than his white counterparts for the same exact offense.  He also had his overtime pay cut as a result of his formal petitions.  And also was denied an opportunity for promotion.

**RELIEF**

WHEREFORE, Plaintiff seeks damages and legal and equitable relief in connection with Defendants' improper conduct, and specifically prays that the Court grant the following relief to Plaintiff by:

a) Declaring the acts and practices complained of herein to be in violation of Section 1983;

b) Enjoining and permanently retraining the violations alleged herein;

c) Entering judgment against the Defendants and in favor of the Plaintiff in an amount to be determined;

d) Awarding compensatory damages to make Plaintiff whole for all lost earnings, earning capacity and benefits, past and future, which Plaintiff has suffered or may suffer as a result of Defendants' improper conduct;

e) Awarding compensatory damages to Plaintiff for past and future pain and suffering, emotional upset, mental anguish, humiliation, and loss of life's pleasure, which Plaintiff has suffered or may suffer as a result of Defendants' improper conduct;

f) Awarding punitive damages to Plaintiff;

g) Awarding Plaintiff such other damages as are appropriate under Title VII, Section 1983, and the PHRA;

h) Awarding Plaintiff the costs of suit, expert fees and other disbursements, and reasonable attorney's fees; and,

i) Granting such other and further relief as this Court may deem just, proper, or equitable including other equitable and injunctive relief providing restitution for past violations and preventing future violations.

Respectfully submitted

Dated: May 3, 2021

*/s/ Andrew Lacy, Jr.*
Andrew Lacy, Jr. Esq.
**THE LACY EMPLOYMENT
LAW FIRM LLC**
2514 W Seybert Street
Philadelphia, PA
(t) 412-301-3908

andrew.lacy@employment-labor-law.com

*Counsel for Plaintiff*