**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TAVIN D. DAVIS, | ) | |
| | ) | No. 21-cv-580 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Judge Robert J. Colville |
| | ) | |
| RICHARD QUINN, JARED SLATER, | ) | |
| JASON SWOPE, THOMAS DUBOVI, SR., | ) | |
| MARTY GRIMM, CHRISTOPHER PARIS, | ) | |
| WILLIAM BROWN, ROBERT | ) | |
| EVANCHICK, and PENNSYLVANIA | ) | |
| STATE POLICE, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

Robert J. Colville, United States District Judge.

Plaintiff Tavin Davis alleges that, beginning shortly after he enlisted with the Pennsylvania State Police, he experienced discrimination by his fellow troopers because of his race. When he attempted to report these and other incidents to his chain of command, his superiors questioned his qualifications, disciplined him, cut his overtime pay, and stalled the disposition of his internal complaints. Davis now brings claims against the State Police and several of its officers under Title VII of the Civil Rights Act of 1984, 42 U.S.C. § 2000e-2 *et seq.* ("Title VII"), the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"), and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 *et seq.* ("PHRA"). [1] Before the Court are two motions to dismiss filed by the

---

[1]     Davis also brought claims under 42 U.S.C. § 1981. Defendants argued in their briefs that those claims were improperly asserted against the individual defendants because they are state actors and that, to the extent Davis asserted claims against the individual defendants in their official capacities, Davis's claims were barred by the Eleventh Amendment. In his response brief, Davis agreed to the dismissal of his Section 1981 claims and clarified that he asserts claims against the

defendants.  As discussed more fully below, I will GRANT each motion in part and DENY each in part.

## I.     FACTUAL BACKGROUND[2]

Davis, who is a black[3] man, enlisted with the State Police in September of 2017.  FAC ¶ 12.  Almost immediately, he began experiencing racism from within the organization.  During his second week, while still a cadet at the State Police Academy, Defendant Marty Grimm (the complaint does not specify whether Grimm was a staff member or a fellow cadet) echoed discriminatory comments made by President Trump about the NFL to Davis's Academy class.  *Id.* ¶ 13.  The next day, after Davis complained about Grimm's comments to Academy staff, Grimm purportedly berated the class, calling them "snowflakes" and told them that, from then on, it would be "straight traffic."  *Id.* ¶¶ 13–14.  Two months later, while still at the Academy, Davis was summoned by a civilian staff member identified as Mr. Puff.  *Id.* ¶ 17.  Mr. Puff allegedly yelled at Davis for arriving late and out of uniform and then charged at him with raised fists, only to be physically restrained by other staff members.  *Id.*

The discrimination did not stop at the Academy.  Davis was promoted to full trooper on April 3, 2018, and assigned to Troop A-Greensburg, where he experienced several incidents of discrimination.  *Id.* ¶ 19.  Soon after his assignment, Davis entered the station and was accosted by a white trooper identified as Terek, who challenged his presence at the station.  *Id.*

---

[2]    individual defendants only in their individual capacities.  Br. in Opp. to Defs. Grimm, Paris, Brown, Maitland and Evanchick's Mot. to Dismiss at 20 & n.4 (ECF No. 26).  Consistent with Davis's concession, I will dismiss his Section 1981 claims.

[2]    I begin by assuming the truth of these facts, as alleged in Davis's First Amended Complaint (ECF No. 17) ("FAC").

[3]    My practice, where feasible, is to defer to a party's own descriptors of their race.  Davis uses the words "African American" and "black" interchangeably to describe his race.  To remain consistent, I use "black" throughout this opinion.  I remain open to direction regarding future writings in this case.

Approximately one month later, in May 2018, Davis found a gnome hung by the neck with tape outside his locker room door. *Id.* ¶ 20.  At some point later in 2018, Davis was in a patrol car with his partner, a trooper identified as Ditzler, who explained his view that there are "two kinds of black people: 'black people and n-words.'"  FAC ¶ 21.  In May 2019, following an overnight shift, a trooper named Folino demanded that Davis fill out Folino's reports for him and, when Davis refused, became violent. *Id.* ¶ 23.  In July 2019, Davis was assigned to a shift during which Davis's colleagues made disparaging comments about black members of Congress and about majority-black communities.  *Id.* ¶ 33.  Later that same month, after Davis's patrol unit responded to a call involving the distribution of KKK literature, his fellow troopers excluded him from joining them in looking at the literature they had seized.  *Id.* ¶ 35.  Davis does not believe that literature was ever entered into evidence.  *Id.*

Davis also witnessed racial profiling, discrimination, and the use of excessive force by white members of Troop A against black citizens, including by his partner, Ditzler.  *Id.* ¶ 22.  Davis recounts one episode where his partner (it is not clear whether the partner in this episode was Ditzler or another trooper) responded to a noise complaint involving several black men standing outside a house by exiting their patrol car with his gun drawn.  *Id.* ¶ 36.  In another episode, Davis recounts that he witnessed an officer throw a young black woman down a flight of stairs and then brag about doing so to his fellow troopers.  *Id.* ¶ 24.  Davis does not believe this latter episode was reflected in the relevant report.  *Id.*  Davis alleges that officers rarely, if ever responded to calls involving white civilians with force.  *Id.*

Davis attempted several times to report the discrimination that he experienced (and witnessed) while in Troop A.  Immediately following his altercation with Folino, Davis attempted to informally report his experience of discrimination, including the discriminatory police conduct

he had witnessed, to Defendant Jason Swope, a corporal in Davis's chain of command. *Id.* ¶¶ 24, 6. Davis alleges that Swope did not investigate the reported discrimination. *Id.* ¶ 24. Instead, he gave both Davis and Folino a "supervisor's notation," a type of minor punishment that remains in the troopers file for only one year, and distorted the facts surrounding the incident to portray Davis and Folino as equally at fault. *Id.*

On June 3, 2019, following his informal report to Swope, Davis was allegedly interviewed by Defendant Richard Quinn, a lieutenant who served as the Patrol Section Commander and the Equal Employment Opportunity liaison for Troop A. *Id.* ¶¶ 28, 4. Relying on Lieutenant Quinn's representation of confidentiality, Davis provided "detailed accounts of implicit bias and racial profiling that fellow officers committed against minorities and discrimination/harassment against" Davis. *Id.* ¶ 28. Davis alleges that he disclosed to Quinn the details of "each and every incident of racial discrimination" that had occurred up to that point. *Id.* ¶ 30. Instead of responding to Davis's allegations, Quinn asked Davis about his views on affirmative action. *Id.* ¶ 29. Davis alleges that Quinn never investigated his report about the discrimination occurring within Troop A. *Id.*

After that interview with Quinn, on June 13, 2019, Davis filed his first formal Equal Employment Opportunity Complaint (the "June 2019 EEO Complaint"), covering the discrimination he had experienced and observed up to that date. *Id.* ¶ 31. Davis alleges that Defendant Thomas Dubovi, the captain of Troop A, was aware of the June 2019 EEO Complaint but took no action to correct the discrimination that was occurring. *Id.* ¶¶ 32, 3. Approximately one month later, he was told by Defendant William Maitland, a lieutenant who served as the Western Section Commander of the Internal Affairs Division, to be prepared to discuss the

complaint with Maitland.  *Id.* ¶¶ 34, 9.  Davis does not allege that Maitland ever followed up to interview him about his complaint.  *Id.*

Davis experienced retaliation for making his June 2019 EEO Complaint.  In August 2019, Davis was told he could not park his new vehicle—which had tinted windows—in the Troop A lot.  *Id.* ¶ 34  Davis alleges that at least two white troopers, whose vehicles also had tinted windows, were permitted to park them in the lot.  *Id.* ¶ 35.  In March 2020, Davis posted a video to the social media website TikTok.  *Id.* ¶ 50.  After a brief internal affairs investigation, Quinn disciplined Davis for violating the State Police social media policy.  *Id.* ¶¶ 50–51.  Davis alleges that two white troopers violated similar policies and were not disciplined.  *Id.* ¶¶ 51–52.  According to Davis, Quinn monitored Davis's social media account and singled him out for punishment for violating the policy.  *Id.* ¶ 52.

After filing his June 2019 EEO Complaint, Davis also noticed that his overtime hours—which form a significant portion of a trooper's compensation—had been reduced.  *Id.* ¶¶ 39–40. He confronted Defendant Jared Slater, a sergeant in his chain of command, about the reduction in his overtime hours.  *Id.* ¶¶ 40, 5.  In response, Slater assigned him a single, four-hour block of overtime while at the same time assigning several blocks to a white trooper.  *Id.*  Davis alleges that the State Police had transitioned from a merit-based to a discretionary overtime policy at some point prior and that this discretionary policy resulted in the reduction of overtime hours for Davis and other black troopers.  *Id.*

Davis eventually requested a transfer from Troop A-Greensburg to Troop H-Lykens.  That request was granted, and he transferred to Troop H on March 14, 2020.  *Id.* ¶ 48.  In January 2020, while his request was pending, Davis requested permission to take a training.  *Id.* ¶ 43.  The training was required for Davis to reach his career goal of becoming a specialized instructor and would

have led to a promotion.  *Id.* ¶¶ 44–46.  Slater denied his request on the grounds that he had a transfer request pending, even though other troopers with pending transfer requests were allowed to take the training.  *Id.* ¶ 43.  Several members of Davis's chain of command, including Dubovi, Quinn, and Slater, knew that Davis's goal was to seek a promotion and become a specialized instructor.  *Id.* ¶ 46.

On July 13, 2020, Davis made a second internal EEO complaint (the "July 2020 EEO Complaint").  *Id.* ¶ 53.  In that complaint, Davis outlined the harassment he had experienced because of his race since he joined the department and the retaliation that he had been subjected to for reporting that harassment.  *Id.*  Davis emailed a copy of his July 2020 EEO Complaint to three high ranking officials within the State Police: (1) Defendant Robert Evanchick, a colonel and the commissioner of the State Police; (2) Defendant Christopher Paris, a lieutenant colonel and the head of several bureaus within the State Police including the Bureau of Human Resources and the Discipline Office; and (3) Defendant William Brown, a captain and the director of the State Police's Equality and Inclusion Office.  *Id.* ¶¶ 53, 7–8, 10.  None of these high-ranking officers responded or otherwise followed up with Davis.  *Id.* ¶ 54.

Davis dual-filed charges with the Equal Employment Opportunity Commission and the Pennsylvania Commission on Human Relations on October 27, 2020.  *Id.* ¶ 55.  In the State Police's response, filed on January 22, 2021, the State Police provided Davis with its resolution of his July 2020 EEO Complaint.  *Id.* ¶ 56.  The substance of that resolution is not described in the FAC.  Davis had still not heard anything about his June 2019 EEO Complaint.

On January 27, 2021, an individual identified as Lt. Clark provided Davis with the disposition of his June 2019 EEO Complaint.  *Id.* ¶ 57.  Maitland had conducted an "IAD" (or internal affairs) investigation rather than the comparatively more serious EEO investigation.  *Id.*

¶¶ 58–59.  Maitland had concluded that Ditzler had violated policy by discriminating against Davis based on his race; however, no disciplinary action was ever taken against Ditzler.  *Id.* ¶¶ 57, 62. Davis does not allege that the disposition of his June 2019 EEO Complaint addressed any of the other instances of discrimination that he had experienced or any of the instances of discrimination against black civilians that he reported.  Although the State Police attributes the delay of over 18 months between his June 2019 EEO Complaint and its January 2021 disposition to administrative error, Davis alleges that the delay was a "deliberate attempt to stall" that fits into a "pattern or practice" by the State Police of stalling the investigation of EEO complaints to frustrate attempts at relief.  *Id.* ¶ 60.

Davis filed his original complaint on May 3, 2021.  *See* Compl. (ECF No. 1).  Davis filed an amended complaint on August 16, 2021.  *See* FAC.  Davis asserts discrimination, hostile work environment, conspiracy, and first amendment retaliation claims under Section 1983 (Counts I and II) and an aiding and abetting claim under the PHRA (Count IV) against the Individual Defendants: Quinn, Slater, Swope, Dubovi, Grimm, Paris, Brown, Maitland, and Evanchick.  Davis asserts a Title VII claim for discrimination, disparate impact, and hostile work environment (Count III) against the State Police.  Defendants Grimm, Paris, Brown, Maitland, and Evanchick filed a motion to dismiss the claims against them in their entirety.  Mot. to Dismiss (ECF No. 20) ("Mot."). Defendants Quinn, Slater, Swope, Dubovi, and the State Police filed a partial motion to dismiss. Partial Mot. to Dismiss (ECF No. 22) ("Partial Mot.").  Both motions have been fully briefed.

## II.     LEGAL STANDARD

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint.  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled

factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The Supreme Court has explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* (quoting *Twombly*, 550 U.S. at 556) (internal citations omitted).

The Third Circuit instructs that "a court reviewing the sufficiency of a complaint must take three steps." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). A district court must first

> "tak[e] note of the elements [the] plaintiff must plead to state a claim." Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."

*Id.* (internal citations omitted) (quoting *Iqbal*, 556 U.S. at 675, 679). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (internal citations omitted).

### III.   DISCUSSION

#### A.  Statute of Limitations

Defendants challenge Davis's claims as barred by the relevant statutes of limitations.  All Defendants argue that Davis's claims under Title VII, the PHRA, and Section 1983 are barred, at least in part, because he waited too long to file with the relevant state agency.  Defendants Grimm, Maitland, Brown, Paris, and Evanchick additionally argue that Grimm's alleged conduct falls outside the relevant window for the statute of limitations.

*1.  Claims Under Title VII, the PHRA, and Section 1983*

I begin with the arguments raised by both sets of Defendants challenging Davis's claims under Title VII, the PHRA, and Section 1983 as falling outside the relevant statute of limitations.

a.  <u>Title VII and the PHRA</u>

A Title VII plaintiff must file a charge with the EEOC within 180 days of the violation.  42 U.S.C. § 2000e-5(e)(1).  Where a plaintiff first files a charge with a state or local agency, they may file with the EEOC within 300 days of the violation.  *Id.*  A plaintiff that dual-files with a state agency may take advantage of the expanded 300-day window for filing.  *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 472 (3d Cir. 2000)  (noting that the time for filing is expanded to "300 days where there has been cross-filing with a state agency under state law").[4]  A

---

[4]      Defendants contend that the proper limitations period for both claims is 180 days because Davis filed his charge with the EEOC and the PCHR concurrently, rather than first filing with the state agency.  But that assertion is at odds with the interpretation of several district courts in the Third Circuit.  *See, e.g.*, *Jarvis v. Analytical Lab. Servs., Inc.*, No. 1:12-cv-574, 2012 WL 1987532, at *3 (M.D. Pa. June 4, 2012) ("Pursuant to 42 U.S.C. § 2000e–5(e)(1), Title VII claims must be

PHRA plaintiff must file a charge with the PHRC within 180 days.  43 Pa. Stat. Consol. § 959(h).

A violation that occurred outside the relevant window for filing is time-barred.  *See Nat'l R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("[D]iscrete discriminatory acts are not

actionable if time barred, even when they are related to acts alleged in timely filed charges.").[5]

      Davis alleges that he dual-filed charges with the EEOC and the PHRA on October 27,

2020.  Thus, Davis's Title VII claims are barred if they accrued prior to January 1, 2020 and his

PHRA claims are barred if they accrued prior to April 30, 2020.  However, Davis argues that,

notwithstanding the statutory filing period, he has plead a continuous violation and, therefore, that

his claims under Title VII and the PHRA are timely.

      "Under the continuing violation doctrine, discriminatory acts that are not individually

actionable may be aggregated to make out a hostile work environment claim; such acts 'can occur

at any time so long as they are linked in a pattern of actions which continues into the applicable

limitations period.'"  *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013) (quoting

*O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006)).  To determine whether a plaintiff

has alleged a hostile work environment claim, as opposed to discrete acts of discrimination, courts

"look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its

---

filed within 180 days of the employment action or 300 days of the employment action where the
plaintiff has filed a concurrent claim with a state agency with the authority to seek relief from such
practice."); *Petrulio v. Teleflex Inc.*, No. , 2014 WL 5697309, at *10 n.11 (E.D. Pa. Nov. 5, 2014)
("Plaintiff filed her EEOC charge, which was dual-filed with the Pennsylvania Human Relations
Commission, on December 23, 2012.  Accordingly, the statute of limitations is 300 days from that
date for plaintiff's Title VII claims and 180 days for plaintiff's PHRA claims."); *Billman v. Easton
Area Sch. Dist.*, No. , 2021 WL 1579913 (E.D. Pa. Apr. 22, 2021) (identifying the "relevant term
under Title VII" as "300 days" where the plaintiff "dual-filed charges of discrimination with the
Equal Employment Opportunity Commission and the Pennsylvania Human Relations
Commission").

[5]    Defendants do not challenge the timeliness of Davis's complaint, only whether he timely
filed his charges with the relevant administrative agencies.

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Morgan*, 536 U.S. at 116. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117.

Here, Davis has plead that the harassment and discrimination he faced while stationed at Troop A constituted a hostile work environment. He alleges that members of Troop A engaged in a pattern of race-based harassment against him beginning on his first day with the Troop. The harassment continued despite Davis's reports to supervisors (which Davis alleges resulted in delay, inaction, and retaliation). These events culminated in Davis's transfer from Troop A to Troop H, which Davis alleges was the result of the harassment he had experienced and was equivalent to a constructive discharge.[6] That transfer occurred well after January 1, 2020. And several acts of retaliation for reporting that same pattern of harassment are alleged to have occurred later in 2020.

Defendant objects that these were discrete acts and could not amount to a pattern because no individual was involved in more than one act. But that is not necessarily accurate. Davis alleges several instances that involved unidentified individuals (e.g., the incidents involving the gnome, the KKK literature, and the comments about black Congressional leaders/black communities). It

---

[6]     Defendants do not challenge Davis's allegation that his transfer from Troop A to Troop H was an adverse employment action akin to a constructive discharge or demotion. This theory has been accepted by several federal courts of appeals. *See, e.g.*, *Sharp v. City of Houston*, 164 F.3d 923, 934 (5th Cir. 1999) (reversing grant of summary judgment where "the jury could have found that the transfer, albeit at [plaintiff's] request, was a constructive demotion, the involuntary result of conditions so intolerable that a reasonable person would feel compelled to leave, and that the transfer constituted a non-trivial adverse employment action."); *Deleon v. Kalamazoo Cty. Road Comm.*, 739 F.3d 914, 920 (6th Cir. 2014) (holding that "under certain circumstances, a voluntary or requested transfer may still give rise to an adverse employment action").

is not possible, at this early stage, to rule out any individual—including those specifically identified in the complaint—as having had a hand in those incidents.

Moreover, even if it were true that no individual committed more than a single act of discrimination, it is well settled that "an extreme isolated act of discrimination can create a hostile work environment." *Castleberry v. STI Grp.*, 863 F.3d 259, 265 (3d Cir. 2017) (collecting cases) (reversing dismissal of hostile work environment claim where defendant's supervisor used the n-word one time in front of him and non-black colleagues coupled with threats of termination). It follows that alleging several incidents of severe discrimination—some of which might independently support a hostile work environment claim—should not defeat a claim, even if those incidents involve different coworkers rather than a single repeat offender.

Defendants do not separately address the application of their limitations defense to Davis's Title VII claim for disparate impact based on the State Police's discretionary overtime policy. "If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002). It is not clear from the face of Davis's complaint that his disparate impact claim is time-barred. Accordingly, I decline to dismiss Davis's disparate impact claim under Title VII at this stage.

Finally, while I recognize that Davis's PHRA claim is subject to a shorter 180-day limitations period, Defendants do not separately brief or address that claim. And, based on my review, it is not "apparent on the face of the complaint" that Davis's PHRA claim is time-barred. *Id.* Accordingly, I decline to dismiss Davis's PHRA claim on that basis at this stage.

b. Section 1983

Defendants similarly argue that Davis's claims under Section 1983 are untimely. "The length of the statute of limitations for a [Section] 1983 claim is governed by the personal injury tort law of the state where the cause of action arose." *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir.

2009) (citing *Wallace v. Kato*, 549 U.S. 384, 387 (2007)).  "The statute of limitations for a [Section] 1983 claim arising in Pennsylvania is two years."  *Id.* (citing 42 Pa. Stat. Consol. § 5524(2)).   Davis filed his complaint on May 5, 2021, alleging violations that arose in Pennsylvania.  Defendants therefore argue that Davis's Section 1983 claims are time-barred to the extent they are based on conduct that occurred before May 5, 2019.

To the extent that argument applies to his Section 1983 claim for hostile work environment, I disagree for the reasons already stated: Davis has plead that the discrimination against him constituted a continuous violation and has identified at least one specific discriminatory act (as a part of the ongoing discriminatory pattern or practice) that occurred after May 5, 2019.  To the extent that Defendants also challenge Davis's first amendment retaliation claim under Section 1983, they do not separately address it in their briefing, and it appears from the face of the complaint that much of the retaliatory conduct occurred after May 5, 2019.  Accordingly, I decline to dismiss Davis's Section 1983 claims at this stage.

### 2. *Claims Against Grimm*

I next address the arguments raised with respect to Grimm.  While I did find that the continuous violation doctrine applies to the discrimination Davis experienced at Troop A, the same analysis does not apply to save Davis's claims against Grimm.  Davis asserts a Section 1983 claim against Grimm for conduct that occurred in September 2017, prior to Davis's time with Troop A, while Davis was a cadet at the State Police Academy.  No information is alleged about Grimm's current or former role with the State Police, whether he was a fellow cadet or an Academy staff member in September 2017, or whether he ever participated in any of the conduct that occurred at Troop A.

Without more information, it is hard to see how Grimm's statements fit within the pattern that occurred while Davis was stationed at Troop A.  Accordingly, I find that Davis's claim against

13

Grimm is based on a discrete act not subject to the continuous violation doctrine. Davis was therefore required to file his Section 1983 against Grimm within two years after the alleged violation occurred. Because Grimm's statements fall far outside that window, they are untimely and must be dismissed.[7]

### B.  Failure to State a Claim

Both sets of Defendants argue that Davis has failed to state a claim: Maitland, Brown, Paris, and Evanchick argue that Davis has failed to plead actionable conduct against each of them, while Quinn, Slater, Swope, Dubovi, and the State Police argue that Davis has failed to state claims under the relevant law.

### 1.  *Claims Against Maitland, Brown, Paris, and Evanchick*

Defendants Maitland, Brown, Paris, and Evanchick ask that I dismiss them from the case in its entirety because Davis has not plead facts sufficient to support any theory of supervisory liability. Mot. at 11–13. "[A] supervisor may be personally liable under [Section] 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Juvenile Detention Center*, 372 F.3d 572, 586 (3d Cir. 2004).

### c.  Maitland

I begin with Maitland. Defendants argue that Davis has neither plead that Maitland was his supervisor, nor shown that Maitland took part or acquiesced in the discrimination Davis experienced. Defendants point out that Davis does not explain *why* an internal affairs investigation is less serious. Defendants also point out that the internal affairs investigation found Ditzler in violation of policy and that such an investigation *could* result in discipline. According to

---

[7]     Because I will dismiss the claims against Grimm as untimely, I do not address the remaining arguments respecting the claims against Grimm.

Defendants, an internal affairs investigation was an appropriate response and Davis has not articulated a violation of his rights by Maitland.

The parties frame the threshold inquiry as whether Maitland was a 'supervisor.'  Davis cites the Supreme Court's decision in *Vance v. Ball State University*, 570 U.S. 421 (2013) as providing the proper framework for analyzing that question.  In *Vance*, the Supreme Court held that:

> an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."

*Id.* at 431 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  *Vance* provides the standard under Title VII for an *employer's* vicarious liability for harassment by its employees. But *Vance* did not discuss the proper standard for analyzing a Section 1983 claim.

Section 1983 provides a cause of action for the deprivation of rights by any person "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia," i.e., under color of law.  42 U.S.C. § 1983.  The relevant inquiry in a Section 1983 claim is thus whether the defendant "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 23 (3d Cir. 1997) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)).

In *Bonenberger v. Plymouth Township*, the Third Circuit rejected the district court's conclusion, in a workplace sexual harassment case under Section 1983, that the defendant "could not meet the color of law requirement solely because he 'had no authority to hire, fire or make any employment decision regarding [the plaintiff] . . . ."  *Id.* (quoting *Bonenberger v. Plymouth Twp.*,

No. Civ. A. 96-403, 1996 WL 729034, at *5 (E.D. Pa. Dec. 18, 1996)).  The court recognized that "[a] state employee may, under certain circumstances, wield considerable control over a subordinate whose work he regularly supervises, even if he does not hire, fire, or issue regular evaluations of her work." *Id.*  Because the defendant had the "direct power to give [the plaintiff] orders when supervising her work shift," including the power to "alter her workload," the court found that "the departmental structure afforded him sufficient authority over [the plaintiff] to satisfy the color of law requirement of [Section] 1983." *Id.*

Davis plead that Maitland was the Western Section Commander of the Internal Affairs Division, he conducted an internal affairs investigation of Davis's June 2019 EEO Complaint instead of an EEO investigation, he delayed concluding that investigation for over 18 months, and he ultimately found Ditzler responsible but took no disciplinary action against him.  These facts give rise to several inferences: (1) Maitland had the power to conduct internal affairs and EEO investigations; (2) Maitland could choose the nature and extent of the investigation conducted; and (3) that Maitland had the power to discipline violators based on his findings.  At this early stage, these allegations are sufficient to show that Maitland wielded considerable control over subordinates pursuant to state law as required to state a claim under Section 1983.

Defendants' remaining objections are best understood as factual disputes regarding Maitland's involvement.  As discussed, Davis alleges, in essence, that Maitland delayed any investigation of his June 2019 EEO Complaint to frustrate Davis's ability to get redress.  Only after Davis instituted formal charges with the EEOC did Maitland conclude his investigation; however, that investigation was, according to Davis, a less substantial internal affairs investigation rather than an EEO investigation.  And, despite finding a violation of policy by at least Ditzler,

Davis alleges that Maitland took no disciplinary action.  That is sufficient to state a claim against Maitland for participating in, and acquiescing to, the violations that Davis has alleged.

d.  <u>Brown, Paris, and Evanchick</u>

Moving on, Defendants Brown, Paris, and Evanchick argue that Davis has failed to state a claim against them because he has not sufficiently shown that they "acquiesced in [their] subordinates' violations." *Luzerne*, 372 F.3d at 586.

In *A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center*, the Third Circuit addressed the scope of supervisory liability under Section 1983.  *Id.*  After articulating the above-referenced standard, the court reversed a district court's grant of summary judgment in favor of two high-level administrators within the detention center.  *Id.*  The court found that summary judgment on the administrators' liability was inappropriate because child-care workers had documented the abuse that plaintiff had suffered in incident reports, and that those incident reports "provided notice to their supervisors."  *Id.*  Even where the record contained some evidence that the administrators had taken "some disciplinary action with respect to certain child-care workers," the plaintiff's evidence that the administrators "took little or no action to protect him" was "sufficient to present a genuine issue of material fact as to their knowledge of and acquiescence in the conduct of the child-care workers."  *Id.*

Davis alleges that he emailed a copy of his May 2020 EEO Complaint to Brown, Paris, and Evanchick and that they took no action in response.  Defendants argue that this is insufficient to establish their liability.  However, at least at this stage, Davis has plead that Brown, Paris, and Evanchick were provided with notice of the harassment that Davis was suffering and took no action in response.  Similar facts barred summary judgment in *Luzerne*, and they suffice to state a claim here.

2. *Hostile Work Environment Claim*

Defendants the State Police, Quinn, Slater, Swope, and Dubovi ask that I dismiss Davis's

hostile work environment claim (which he asserts under Section 1983 against the individual

defendants and under Title VII against the State Police).

"[A] plaintiff 'may prove an equal protection claim by establishing that he or she was

subjected to a hostile work environment.'" *Ugorji v. N.J. Envtl. Infrastructure Tr.*, No. 12-5426

(FLW), 2014 WL 2777076, at *4 (D.N.J. June 19, 2014) (quoting *Pollock v. City of Phila.*, No. ,

2008 WL 3457043, at *8–9 (E.D. Pa. Aug. 8, 2008)); *see also Starnes v. Butler Cty. Ct. of Common*

*Pleas, 50th Jud. Dist.*, 971 F.3d 416, 428 (3d Cir. 2020) (holding that hostile work environment

claims are cognizable under Section 1983).  To plead a hostile work environment claim under

either Title VII or Section 1983, a plaintiff must allege that: "(1) [he] suffered intentional

discrimination . . . ; (2) the discrimination was severe or pervasive; (3) the discrimination

detrimentally affected [him]; (4) it would have detrimentally affected a reasonable person in like

circumstances; and (5) a basis for employer liability is present." *Komis v. Sec'y of U.S. Dep't of*

*Labor*, 918 F.3d 289, 293 (3d Cir. 2019) (quoting *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir.

2006) *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53

(2006)); *Starnes*, 971 F.3d at 428.

Defendants argue that Davis has failed to allege incidents of discrimination that are

sufficiently "severe or pervasive" to create a hostile work environment.  According to these

Defendants, Davis has plead only isolated incidents of discrimination by different individuals and

that these allegations cannot be "severe or pervasive" enough to affect the conditions of Davis's

employment.

I have already found that Davis has plead facts sufficient to state a continuing violation,

and those facts also state a claim for a hostile work environment for the same reasons.  The pattern

of harassment and retaliation that Davis has plead was sufficiently "severe or pervasive" to state a claim for a hostile work environment, particularly where at least some of the incidents of harassment may have been sufficiently severe to independently support a hostile work environment claim. *C.f. Castleberry*, 863 F.3d at 266 (reversing dismissal of hostile work environment claim where supervisor used n-word and made threats of termination one time).

   3. *Conspiracy Claim*

   Defendants the State Police, Quinn, Slater, Swope, and Dubovi next ask that I dismiss Davis's conspiracy claim. They argue that Davis has not plead facts supporting a reasonable inference that any agreement existed to deprive him of his rights.

   "The elements of a claim of conspiracy to violate federal civil rights are that '(1) two or more persons conspire to deprive any person of [constitutional rights]; (2) one or more of the conspirators performs . . . any overt act in furtherance of the conspiracy; and (3) that overt act injures the plaintiff in his person or property or deprives the plaintiff of any right or privilege of a citizen of the United States,' with the added gloss under § 1983 that 'the conspirators act under the color of state law.'" *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 294 n.15 (3d Cir. 2018) (quoting *Barnes Found. v. Twp. of Lower Merion*, 242 F.3d 151, 162 (3d Cir. 2001)). "[T]o properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred." *Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010). The facts alleged must raise "a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.

   Upon my review of the complaint, Davis has not alleged anything more than the precise type of parallel conduct that is insufficient to support a conspiracy claim. Davis points to two paragraphs which he says establish a conspiracy. First, Davis points to his allegation in paragraph 60 that:

> The PA State Police, by and through its policymakers, have no interest in solving the racial problems that persist in the department. Rather, they choose to bury internal complaints without any regard to changing the culture that causes them. Defendants collectively are all aware of these practices. And they act in agreement and concert together to implement them, stifling the civil rights of black troopers in the process.

FAC ¶ 60. But this conclusory paragraph merely asserts, without support, that there was common awareness of a systemic problem and an implicit "agreement" to not remedy the problem. Davis does not plead facts showing that an agreement in fact existed or showing that any particular defendant(s) took any specific action in advancement of such an "agreement" or otherwise agreed to deprive Davis of his rights.

Next, Davis points to his allegation in paragraph 81:

> The PA State Police, by and through its supervisors and policymakers, had contemporaneous knowledge of the incidents of racial discrimination and harassment that Mr. Davis faced, and the inaction by PA State Police and its supervisors (Defendants) communicated messages of approval to the offending subordinates.

*Id.* ¶ 81. Davis does not plead that any defendant explicitly communicated a message of approval to any subordinate; rather, he alleges that Defendants collectively, though only implicitly, communicated approval by inaction. That may suffice to render them individually liable; however, silence and inaction, without more, cannot support a finding of conspiracy. Accordingly, I will dismiss Davis's conspiracy claim.

### 4. *Disparate Impact Claim*

Finally, Defendants the State Police, Quinn, Slater, Swope, and Dubovi ask that I dismiss Davis's disparate impact claim. Partial Mot. at 14–15. They argue that Davis has failed to state a claim for disparate impact because he has failed to identify a facially neutral policy that results in disparate impact. According to these Defendants, because Davis alleges that the State Police

imbues supervisors with discretion in assigning overtime, Davis has really alleged intentional discrimination.

The Supreme Court has held "that subjective or discretionary employment practices may be analyzed under the disparate impact approach in appropriate cases." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991 (1988); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 (2011) (noting that "giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory—since 'an employer's undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination'" but holding that such claims are not necessarily common to a class (quoting *Watson*, 487 U.S. at 990–91) (alteration in original)).  Following these precedents, district courts have permitted claims for disparate impact where the challenged policies involved the exercise of discretion.  *See, e.g.*, *City of Phila. v. Wells Fargo & Co.*, No. 17-2203, 2018 WL 424451, at *5 (E.D. Pa. Jan. 16, 2018) (permitting claims for disparate impact under the Fair Housing Act where defendants discretionary mortgage lending policies allegedly resulted in black and latino borrowers receiving higher risk loans than similarly situated white borrowers).

Here, Davis has alleged that the State Police replaced an objective, merit-based system of overtime assignments with a system of virtually unlimited discretion.  This subjective system resulted in black troopers—including Davis—receiving less overtime than white troopers.  These allegations suffice to state a claim for disparate impact.

   *5.  PHRA Claim*

In their reply, Defendants, Maitland, Paris, Brown, and Evanchick challenge whether Davis has stated a claim against them under the PHRA.  It is not clear that they raised this argument in their opening brief, which does not separately discuss the PHRA.  Therefore, it may be waived. *Konold v. Sup. Int'l Indus., Inc.*, 911 F. Supp. 2d 303, 307 n.2 (W.D. Pa. 2012) (declining to

consider new argument raised for the first time in defendants' reply brief).  Assuming that it was not waived, Defendants' argument respecting Davis's PHRA claim against them is duplicative of their arguments that Davis failed to state a claim against them individually and fails for the same reasons.

### C.  Qualified Immunity

Finally, Defendants Maitland, Paris, Brown, and Evanchick argue that each of them is entitled to qualified immunity on Davis's Section 1983 claims.  "In considering whether qualified immunity attaches, courts perform a two-pronged analysis to determine: (1) 'whether the facts that [the] plaintiff has alleged . . . make out a violation of a constitutional right,' and (2) 'whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct.'"  *Kedra v. Schroeter*, 876 F.3d 424, 434 (3d Cir. 2017) (alterations in original) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  "For a constitutional right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Starnes*, 971 F.3d at 426 (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  Courts therefore "ask if the case law at the time of the violation would have put the official on 'fair notice' that his conduct violated the plaintiff's rights."  *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

### 1.  *Fourteenth Amendment Discrimination and Hostile Work Environment Claims Under Section 1983*

I have already found that Davis has plead facts sufficient to state a claim for a violation of his rights under the fourteenth amendment.  Accordingly, I must determine whether those rights were "clearly established" at the time of the violation.  *Pearson*, 555 U.S. at 232.

Defendants urge that Davis was required to point to a factually analogous case to show that the law was "clearly established."  The Supreme Court has required that approach in certain contexts, including cases brought for violations of the fourth amendment.  *See, e.g.*, *White v. Pauly*,

580 U.S. 73, (2017) (holding that the court of appeals erred when it "failed to identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated the Fourth Amendment").  That approach is necessitated by the Supreme Court's holding that its cases setting out excessive force principles in fourth amendment cases "do not by themselves create clearly established law outside an 'obvious case.'"  *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).

 The courts of appeals—including the Third Circuit—have taken a different approach when addressing qualified immunity in the context of claims for discrimination under the fourteenth amendment.  They have held instead that "[t]he constitutional right to be free from [racial or gender] discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it."  *Wimbley v. Cashion*, 588 F.3d 959, 963 (8th Cir. 2009) (alteration in original) (quoting *Goodwin v. Circuit Court of St. Louis Cty.*, 729 F.2d 541, 546 (8th Cir. 1984)); *see also Flores v. Pierce*, 617 F.2d 1386, 1392 (9th Cir. 1980) ("No official can in good faith impose discriminatory burdens on a person or group by reason of a racial or ethnic animus against them. The constitutional right to be free from such invidious discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it."); *Andrews v. City of Phila.*, 895 F.2d 1469, 1480  (3d Cir. 1990) *superceded in part by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1072 ("We are constrained to hold that Liciardello and Doyle objectively should have known the applicable legal standard, and thus are not protected by qualified immunity in treating, or allowing their subordinates to treat, female employees differently on the basis of gender in their work environment.").

Indeed, the Third Circuit recently denied qualified immunity for violations of the fourteenth amendment like those at issue here without relying on a factually analogous case, recognizing that the law controlling claims for discrimination has long been clearly established. *See Starnes*, 971 F.3d at 427–29 (denying qualified immunity on claims for discrimination and hostile work environment under Section 1983); *see also Ugorji*, 2014 WL 2777076, at *6 ("In the employment context, the Third Circuit has noted that supervisors . . . objectively should know not to treat subordinates like Plaintiff differently because they are members of a protected class.") (citing *Andrews*, 895 F.2d at 1480). Accordingly, at least at this early stage, Defendants are not entitled to qualified immunity on Davis's fourteenth amendment claim under Section 1983.

2.  *First Amendment Retaliation Claim Under Section 1983*

Defendants do not separately discuss Davis's first amendment retaliation claim under Section 1983. The Third Circuit recently held that "[t]he law is clearly established that [a defendant] may not retaliate against [a plaintiff] for exercising [his] First Amendment rights." *Id.* at 429. Based on my review of the complaint, it appears that Davis has stated a cognizable claim for retaliation in violation of the First Amendment under Section 1983. Accordingly, at least at this early stage, Defendants are not entitled to qualified immunity on that claim.

**D.  Amendment**

Davis requested leave to amend the FAC if I were to grant either of the pending motions to dismiss. "If a plaintiff requests leave to amend a complaint vulnerable to dismissal before a responsive pleading is filed" in a civil rights case, a court must permit amendment unless it would be inequitable or futile. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *see also id.* at 108 ("When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile."). I see no reason why

24

amendment would necessarily be futile.  Accordingly, my dismissals will be without prejudice and I will grant Davis leave to amend the FAC within 14 days of the entry of an order consistent with this opinion.

### IV.     CONCLUSION

For the reasons discussed above, I will GRANT the motions in part and DENY them in part.  All claims against Defendant Marty Grimm will be dismissed without prejudice.  Further, Davis's claims under Section 1981 and his claim for conspiracy to deprive him of his Fourteenth Amendment rights under Section 1983 will be dismissed without prejudice.  The motions to dismiss will be denied in all other respects.

Davis will be granted leave to amend the FAC within 14 days from the entry of an order consistent with this opinion.  Within 14 days of that date, Defendants will answer the FAC or will answer or otherwise respond to a further amended complaint, should Davis file one.   An appropriate order follows.

BY THE COURT:

s/*Robert J. Colville*
Robert J. Colville
United States District Judge

DATED: July 29, 2022

cc: All counsel of record